IN THE UNITED STATE DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PARKWAY CLINICAL<br>LABORATORIES, INC.,<br>               Plaintiff,<br><br>v.<br><br>CITIZENS BANK, N.A.,<br>               Defendant. | Case No. 2:19-cv-05920-NIQA |

**PLAINTIFF'S REPLY TO DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**I.     INTRODUCTION**

The principal theme of Defendant Citizens Bank, N.A.'s ("Citizens Bank") Memorandum in Opposition to Plaintiff Parkway Clinical Laboratories, Inc.'s ("PCL") Motion for a Preliminary Injunction ("Memorandum in Opposition") is that PCL is requesting this Court to re-write the contract between the parties.  That is not the case.  To be clear, PCL is not suggesting Citizens Bank cannot close PCL' accounts.  PCL is simply asking for the same opportunities Citizens Bank reserved for itself in the Deposit Account Agreement ("Deposit Agreement")[1] — the ability to respond in a reasonable manner to the notice of the intent to close the accounts.  See Deposit Agreement (attached as Exhibit A to Defendant's Memorandum in Opposition), p. 15 ("Any request to close your account will be effective only after we have received your request and **we have had a reasonable opportunity to act on such request**.")(emphasis added).  Given the nature of PCL's business, and the prior course of dealings between the parties, two months is insufficient for PCL to complete the process of establishing new payment arrangements with its insurance

---

[1] Citizens indicates the Deposit Agreement attached as Exhibit A to its Memorandum in Opposition is the relevant agreement between the parties; however, it does not aver when the Deposit Agreement was entered into or how PCL assented to its terms.

1

companies. Citizens Bank was previously made aware of the impact an account closure would have on PCL's business, and its failure to allow PCL sufficient time to complete the change in payment arrangements now is a breach of the covenant to operate in good faith and deal fairly with its long-term customer.

II. **ARGUMENT**

    A. **Plaintiff's Causes of Action against Defendant Are Likely to Succeed Given the Prior History between the Parties on This Issue.**

PCL was caught off-guard when it received Citizens Bank's October 28, 2019 letter because it reasonably believed the underlying issues related to the closure of its accounts were resolved by the parties in 2017. Indeed, in September 2017, PCL received a letter from Citizens Bank that is nearly identical to the October 28, 2019 letter, advising PCL that Citizens Bank intended to close PCL's accounts. A true and correct copy of this letter is attached hereto and incorporated herein as Exhibit "A." Upon receipt of Citizens Bank's September 7, 2017 letter, PCL immediately emailed its principal contact at Citizens Bank and advised "We are surprised to receive the ... notice of closure of our accounts .... We have a 40 plus year ... relationship.... We ... employ more than 100 people and collect revenues from so many payors.... This would create a very big logistic nightmare." A true and correct copy of PCL's September 11, 2017 email is attached hereto and incorporated herein as Exhibit "B." Accordingly, as of September 2017, Citizens Bank was on notice of the substantial harm that would befall PCL if its accounts were abruptly closed and the "logistical nightmare" that would be created if PCL had to modify its electronic payment relationships with its insurance companies.

Importantly, the rationale for Citizens Bank's attempt to close PCL's accounts now – which was revealed only after this action was filed – is the same rationale behind the threatened closure in 2017. But Citizens' concerns were addressed and completely resolved in 2017, and the parties

continued their relationship.  **Nothing** has changed in the last two years that justifies Citizens' closing the accounts without giving PCL a reasonable opportunity to act on that closure – especially when Citizens knows, because it was explicitly told two years ago, of the nightmarish consequences that closure on short notice would have on PCL.  Citizens Bank's current actions fly in the face of the agreement reached by the parties to address Citizens' concerns in 2017, and Citizens' sudden attempt to abrogate that arrangement further demonstrates its lack of good faith and fair dealing.

The 2017 threat to close PCL's accounts was the result of Citizens Banks concerns over payments to the same Politically Exposed Person ("PEP")[2] referenced in its current Memorandum of Opposition.  When that concern was raised in 2017, PCL provided Citizens Bank with substantial documentation explaining the legitimate relationship PCL had with the PEP and the PEP's role in PCL's business dealings in the United Arab Emirates.[3]  Citizens Bank was apparently satisfied with the explanation and documentation provided, as it chose not to close PCL's accounts and continue its banking relationship with PCL.  Citizens and PCL agreed at a meeting on December 15, 2017 that PCL would provide advance notice of payments to Middle-Eastern entities

---

[2] PEP is a term coined by the Financial Action Task Force ("FATF"), an international inter-governmental body established by its member countries to combat money laundering, terrorist financing, and other related threats to the integrity of the international financial system.  FATF defines a PEP as "an individual who is or has been entrusted with a prominent public function," that potentially can be exploited to commit money laundering.  See FATF Guidance, Politically Exposed Persons at 3, https://www.fatf-gafi.org/documents/documents/peps-r12-r22.html.  FATF recommends that banks perform certain due diligence when their customers are PEPs.  Here, the PEP is a consult of Citizens' customer, PCL, not a customer himself.  But FATF also makes clear that these measures are prophylactic and "should not be interpreted as stigmatising PEPs as such being involved in criminal activity." Id.  FATF specifically notes that, "Refusing a business relationship with a PEP simply based on the determination that the client is a PEP is contrary to the letter and spirit of" its recommendations.  Id.

[3] The PEP at issue here was Pervez Musharraf, the former President of Pakistan.  Based on his experience and relationships in the region, President Musharraf was engaged by PCL to provide guidance on expanding its business in the UAE, in particular an opioid testing and monitoring public policy initiative that had the potential to generate $1 billion in revenue.  The existence and nature of PCL's relationship with President Musharraf and the details of this proposal were not a secret and were shared with Citizens, along with relevant documentation, in 2017.  See, e.g., September 18, 2017 email and attachments, attached hereto as Exhibit "C."

so that Citizens was aware of the transaction ahead of time and, presumably, could clear the transfers in advance.

Citizens did not prohibit additional payments to the PEP; however, to preserve and strengthen its relationship with Citizens, and as an implicit acknowledgment of the importance of the Citizens accounts to PCL's core business, PCL ceased making payments to the PEP at that time as well. The last payment to the PEP referenced in Citizens' brief as the justification for the current account closure was made on September 1, 2017.

PCL reasonably believed that so long as it continued this practice, Citizens Bank would not have any reason to close its accounts. PCL abided by this agreement in all respects, and Citizens Bank's attempt to resurrect this issue as grounds for a snap-closure of PCL's accounts is baseless. Nothing has happened since 2017 that creates the exigency claimed by Citizens Bank for abruptly closing PCL's accounts. No payments have been made to the PEP since 2017 and Citizens has received advance notice of each PCL transaction from the Citizens accounts in the Middle East. PCL relied upon several assurances by Citizens Bank in 2017 that this issue had been fully resolved and the parties' course of dealing over the last two-plus years did not reflect any threat of the closure of the accounts. Citizens Bank's efforts now to undo the arrangement between the parties on short notice smacks of bad faith.

**B.     The Need for More Time Is Driven by The Nature of PCL's Business.**

Contrary to Citizens Bank's assumptions in its Memorandum in Opposition, PCL began the process of transferring its accounts immediately upon receiving the October 28, 2019 letter. However, PCL cannot complete the process by simply making a few phone calls and "converting just five payors per day" as suggested by Citizens Bank. Citizens Bank should know better, especially given the information provided to it when it raised this issue in 2017. The process is

intensive and requires a substantial amount of time to complete — it can take six weeks per insurance company, not one day. PCL has devoted two employees to this task and has brought a former employee back as a consultant to help administer this process. Even though it acted immediately and devoted significant resources to the cause, to date, PCL has successfully transferred approximately eighty-nine insurance companies to a new bank account. That represents less than one-third of the total number of insurance companies PCL estimates it will need to transfer to a new account.

The nature of PCL's business is the reason this process is especially burdensome and requires more time than many other businesses may need. PCL provides routine and esoteric diagnostic medical testing, primarily to the patients of addiction and pain management specialists. While the bulk of its revenue comes from payments by insurance companies, PCL's "customers" are, in a sense, the physicians who refer patients to PCL for testing. PCL is not a participant in any insurance plan and submits claims to whatever insurance a referred patient may have. Because PCL is almost always an out-of-network provider, PCL may not be known to the patient's insurance company before services are performed.

Therefore, the first step in the process for transferring PCL's payment arrangements is reviewing its files to identify the insurance companies it needs to contact and finding the right person or persons with whom to speak. Moreover, many insurance companies use third party administrators to manage the claims and payments. This alone can add an additional layer of paperwork to an already difficult process. Furthermore, PCL operates in 28 states and receives payments from payors in 30 states. In some cases, an insurance company might use a different third-party administrator or sub-insurance plan for different regions, states, or even parts of states. For example, in order to transfer accounts for certain payments from Magellan for testing provided

in six counties in eastern Pennsylvania, PCL submitted banking changes for all six counties, as recommended by Magellan, on the Magellan provider portal. Upon making the changes and the elapse of processing time of four weeks, PCL was still receiving payments for one of the counties into its Citizens Bank account. After several calls and despite multiple reassurances of acceptance of the change of bank account, PCL continues to still receive this county's payments in the Citizens account, as recently as December 31, 2019. Despite being one of the first insurance companies PCL contacted to begin the transfer process, PCL is still struggling to have the bank change take effect two months later.

      Once the correct insurance company or administrator is identified, PCL must obtain the correct contact information for the relevant person or department who handles the payment arrangements and request the appropriate paperwork. Again, because it does not have pre-existing contracts with insurance companies, it may not have an on-going relationship with the insurance company or a direct contact to the responsible party. The documentation can be lengthy, convoluted, and the process can be a bureaucratic nightmare. Once the paperwork is submitted, it typically takes four to six weeks to be processed before receiving approval, assuming all of the documentation has been correctly completed and all requested information has been provided.

      Four to six weeks is the absolute minimum amount of time it would take to transfer one of PCL's insurance company accounts — it has approximately 300 to transfer. Even when the process appears to have been completed, PCL must still verify that future payments will be made to its new accounts, not to the Citizens accounts. Unfortunately, this has sometimes not been the case. Despite submitting the required documentation and receiving approval of the transfer in payment instructions, some of the insurance companies have still sent payments to Citizens Bank. At a minimum, this requires additional calls, correspondence, and paperwork to the insurance company

to correct the mistake again, but may call for the process to be started anew. Therefore, the process is, in a meaningful sense, not completed until a payment is successfully made by the insurance company payor to the new accounts.

PCL's need for time to respond to the account closure is real and the failure to provide it will be disastrous.

### C. The Harm Caused Would Be Irreparable and the Balance of the Harms Weighs in PCL's Favor.

Citizens Bank tersely suggests there can be no irreparable harm here because any damages can be compensated through monetary relief. It provides no method for determining those damages or any other support for this claim. To the contrary, as alleged in its Complaint, PCL would suffer irreparable harm if it cannot complete the process for transferring its insurance company payors to a new account prior to Citizens closing the accounts. That harm comes in the form of lost business opportunities and market share, the loss of employment of 100 individuals, and the closure of the business itself. Damages for such results can only be estimated by conjecture; therefore the harm is irreparable. See York Group, Inc. v. Yorktowne Caskets, Inc., 924 A.2d 1234, 1242 (Pa. Super. 2007) ("An injury is regarded as 'irreparable' if it will cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard")(citing West Penn Specialty MSO, Inc. v. Nolan, 737 A.2d 295, 299 (Pa. Super. 1999)).

Even if Citizens Bank's closure of the accounts only results in a temporary disruption of PCL's business, the harm caused can still be significant and certainly outweighs any possible harm to Citizens Bank. If the accounts are closed before PCL can transfer the process of payments from insurance companies to a new account, the best case scenario for PCL is that an insurance company will provide notice that it is unable to deposit payment into PCL's account and allow PCL to begin the minimum 4-6 week process of establishing a new account. The reality, however, is that many

insurance companies will not provide such notice. PCL will receive an explanation of benefits, indicating that payment should be made, but no indication that it was not. PCL is a small company that has posted losses for most of its existence. A delay of even 4-6 weeks of revenue will present existential cashflow problems for PCL. Employees and vendors will not be paid, and the likelihood is that the business will close.

A far less dire example gives a glimpse of the consequences that will befall PCL if Citizens is permitted to go through with its snap-closure of the accounts. In 2017, during the first dispute over the closure of PCL's accounts, Citizens Bank froze PCL's accounts for two days and refused to accept additional payments from insurance companies on behalf of PCL. One of the entities that attempted to deposit funds into PCL's account during those two days was New Jersey's Medicaid program ("NJ Medicaid"). As a result of the deposit being rejected, NJ Medicaid ceased making payments directly to PCL and instead, placed future payments in escrow. PCL was not notified of this then or after its accounts were unfrozen. It discovered the payments were not being made in early 2018, and since that time, has sought to have the payments issued to it from the escrow fund. Despite the passage of nearly two years, to date, PCL has only been able to recover approximately $150,000 of the $500,000 of payments estimated to have been missed. A two-day disruption of PCL's accounts cost $500,000 in lost payments from one payor, which PCL is still trying to recover two years later. The premature closure of PCL's accounts, before PCL has a reasonable opportunity to transfer accounts, will be exponentially worse and endanger the very existence of the business and jobs of its 100 employees.

Against this immediate, irreparable harm to PCL, Citizens Bank offers nothing to explain any harm that it may suffer. Although it references its discomfort with payments to a PEP, those payments ceased in 2017 when the matter was initially brought to PCL's attention by Citizens

Bank. Even if payments were made to the PEP, Citizens does not explain how it is harmed by that transaction or why it creates such an urgency to close PCL's accounts prior to PCL completing the transfer of its insurance company accounts to a new financial institution. Citizens will ultimately be able to close PCL's accounts and assuage whatever apparent discomfort the bank continues to harbor over transactions that ceased more than two years ago. But Citizens has provided no justification whatsoever for closing PCL's accounts before PCL has a reasonable opportunity to act on that closure – the same opportunity that Citizens reserves for itself. The covenant of good faith and fair dealing demands that PCL be given that same chance.

### III.  CONCLUSION

For the forgoing reasons, as well as those articulated in Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction, Plaintiff has shown its entitlement to a preliminary injunction requiring Defendant Citizens Bank, N.A. to delay the termination of Plaintiff's bank accounts until such time as the merits of this case are determined.

Respectfully submitted,

SAXTON & STUMP, LLC

Dated: January 3, 2020

By: s/Jason G. Benion
Ronald H. Pollock, Jr., Esquire
Attorney ID No. 52586
rhp@saxtonstump.com
Jason G. Benion, Esquire
Attorney ID No. 307500
jgb@saxtonstump.com
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
717-556-1000
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Jason G. Benion, Esquire, hereby certify that on this date, I served a true and correct copy of the foregoing Plaintiff's Reply to Defendant's Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction upon Defendant, Citizens Bank by ECF as follows:

Andrew J. Soven, Esq.
Holland and Knight, LLP
Cira Centre, Suite 800
2929 Arch Street
Philadelphia, PA  19104
Andrew.Soven@hklaw.com

Dated: January 3, 2020                              By:     s/Jason G. Benion
                                                            Jason G. Benion, Esquire